Rec# 551048

SCANNED

48·Pgs
Exh 1

## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

LELAND HOUSE LIMITED PARTNERSHIP
COMPANY, a Michigan Limited Partnership,

                Plaintiff,

vs.

RAMADA FRANCHISE SYSTEMS, INC.,
n/k/a RAMADA WORLDWIDE INC., a
Delaware Corporation,

                Defendant.

```
JUDGE : Battani, Marianne O.
DECK  : S. Division Civil Deck
DATE  : 09/08/2005 @ 16:18:49
CASE NUMBER : 2:05CV73472
REM LELAND HOUSE LTD PARTNERSHIP
V. RAMADA FRANCHISE SYS (DA)
```

MAGISTRATE JUDGE DONALD A. SCHEER

_____/

Martin C. Weisman (P22139)
Wilfred Eric Steiner
Attorneys for Plaintiff
30100 Telegraph Road, Suite 428
Bingham Farms, Michigan  48025
(248) 258-2700

DICKINSON WRIGHT PLLC
Jason P. Klingensmith (P61687)
Attorneys for Defendant
500 Woodward Avenue, Suite 4000
Detroit, Michigan  48226
(313) 223-3051

_____/

## NOTICE OF REMOVAL

TO:    Clerk of the Court
       Wayne County Circuit Court
       CAYMC
       Two Woodward Avenue
       Detroit, Michigan  48226-3413

                    Martin C. Weisman (P22139)
                    Wilfred Eric Steiner
                    30100 Telegraph Road, Suite 428
                    Bingham Farms, Michigan  48025

Pursuant to U.S.C. §§ 1441 and 1446, Defendant Ramada Franchise Systems, Inc. n/k/a

Ramada Worldwide Inc. ("Defendant" or "Ramada") hereby removes this action from the Circuit

Court for the County of Wayne, Michigan, where it is pending, to the United States District

Court for the Eastern District of Michigan, Southern Division.   In support of its Notice of Removal, Ramada states as follows:

1.      On August 1, 2005, Plaintiff Leland House Limited Partnership Company ("Plaintiff" or "Leland House") commenced this action against Ramada in the Circuit Court for the County of Wayne, Michigan, by filing a Complaint styled *Leland House Limited Partnership Company v. Ramada Franchise Systems, Inc.*, Case No. 05-522455CK ("*Leland House v. Ramada*").

2.      The Circuit Court for the County of Wayne, Michigan, is located in the Eastern District of Michigan, Southern Division.

3.      The Summons and Complaint (attached hereto as Exhibit 1) were served on Ramada via certified mail on August 12, 2005.   No further pleadings, process or orders have been issued or served in this action.

4.      Defendant Ramada is the only Defendant named in the Complaint issued in this action.

5.      Leland House is a limited partnership organized under the laws of the State of Michigan.   Leland House's principal place of business is located in Detroit, Michigan and all of its members, are residents and citizens of the State of Michigan.   Therefore, Leland House is a resident and citizen of the State of Michigan for purposes of 28 U.S.C. § 1332.

6.      Ramada is incorporated in the State of Delaware and has its principal place of business in Parsippany, New Jersey, and therefore is a resident and citizen of the States of Delaware and New Jersey for purposes of 28 U.S.C. § 1332.

7.      The Complaint, though incorrectly, alleges that Plaintiff is entitled to damages for breach of contract and promissory estoppel, and also seeks a declaratory judgment that it is

entitled to terminate the franchise agreement between Plaintiff and Ramada.  The Complaint, at Paragraph 27, demonstrates an amount in controversy in excess of $75,000.00, exclusive of interest and costs.

8.      This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the parties in this matter are completely diverse and the amount in controversy exceeds $75,000.00, exclusive of interests and costs.

9.      This action therefore is removable to this Court pursuant to 28 U.S.C. § 1441.

10.      This Notice of Removal is timely under 28 U.S.C. § 1446(b) because it is filed within thirty (30) days of August 12, 2005, the date on which Defendant first received a copy of the State Court Complaint and Summons.

11.      Service and notice of the filing of this Notice of Removal will be given to all adverse parties as required by 28 U.S.C. § 1446(d) and a true and correct copy of the Notice of Removal will be filed with the Clerk of Courts for the Circuit Court for the County of Wayne, Michigan, as provided by law.

WHEREFORE, Defendant Ramada respectfully requests that the above-described action now pending against it in the Circuit Court for the County of Wayne, Michigan, be removed to this Court.

Respectfully Submitted,

DICKINSON WRIGHT PLLC

By: _____
        Jason P. Klingensmith (P61687)
        Attorneys for Defendant
        500 Woodward Avenue, Suite 4000
        Detroit, MI 48226
        (313) 223-3500

and

Steven A. Goldfarb
Rose Marie Fiore
Joni Todd
HAHN LOESER & PARKS LLC
3300 BP Tower
200 Public Square
Cleveland, Ohio  44114
(216) 621-0150

Dated:  September 8, 2005

DETROIT 28753-2 896294v1

| STATE OF MICHIGAN<br>THIRD CIRCUIT COURT<br> | **SUMMONS AND<br>RETURN OF SERVICE** | CASE NO.  05-522445 CK |
| --- | --- | --- |

| COURT<br>ADDRESS: 2 WOODWARD AVENUE, DETROIT, MICHIGAN 48226 | COURT<br>TELEPHONE NO. (313) 224- |
| --- | --- |

THIS CASE ASSIGNED TO JUDGE:  MICHAEL F. SAPALA            Bar Number: 19891

| PLAINTIFF | DEFENDANT |
| --- | --- |
| .ELAND HOUSE LP COMPANY        PL 01   VS   RAMADA FRANCHISE SYSTEMS INC    DF 002 | |

PLAINTIFF'S ATTORNEY

MARTIN C. WEISMAN
(P-22139)
30100 TELEGRAPH RD STE 428
BINGHAM FARMS, MI  48025-4564
248-258-2700

| CASE FILING FEE | JURY FEE |
| --- | --- |
| PAID | NO JURY DEMAND FILED |

| ISSUED | THIS SUMMONS EXPIRES | DEPUTY COUNTY CLERK |
| --- | --- | --- |
| 08/01/05 | 10/31/05 | BRENDA REESE |

*This summons is invalid unless served on or before its expiration date.      Cathy M. Garrett – Wayne County Clerk

**NOTICE TO THE DEFENDANT:** In the name of the people of the State of Michigan you are notified:
1. You are being sued.
2. YOU HAVE 21 DAYS after receiving this summons to file an answer with the court and serve a copy on the other party or to take other lawful action (28 days if you were served by mail or you were served outside this state).
3. If you do not answer or take other action within the time allowed, judgment may be entered against you for the relief demanded in the complaint.

☒ There is no other pending or resolved civil action arising out of the same transaction or occurrence as alleged in the complaint.
☐ A civil action between these parties or other parties arising out of the transaction or occurrence alleged in the complaint has been previously filed in _____ Court.
☐ There is no other pending or resolved action within the jurisdiction of the family division of circuit court involving the family or family members of the parties.
☐ An action within the jurisdiction of the family division of the circuit court involving the family or family members of the parties has been previously filed in _____ Court.

The docket number and assigned judge of the civil/domestic relations action are:

| Docket no. | Judge | Bar no. |
| --- | --- | --- |
| | | |

The action  ☐ remains   ☐ is no longer    pending.

I declare that the complaint information above and attached is true to the best of my information, knowledge, and belief.

Date  6/10/05

Signature of attorney/plaintiff

**COMPLAINT IS STATED ON ATTACHED PAGES. EXHIBITS ARE ATTACHED IF REQUIRED BY COURT RULE.**
If you require special accommodations to use the court because of disabilities, please contact the court immediately to make arrangement.

FORM NO. WC101
REV. (3-98)    MC 01 (10/97)    **SUMMONS AND RETURN OF SERVICE**    MCR 2.102(B)(11), MCR 2.104, MCR 2.107, MCR 2.113(C)(2)(a), (b), MCR 3.206 (A)
DEFENDANT

For best results use a felt pen

| RETURN OF SERVICE | Case No. |

TO PROCESS SERVER: You are to serve the summons and complaint not later than 91 days from the date of filing. You must make and file your return with the court clerk. If you are unable to complete service you must return this original and all copies to the court clerk.

## CERTIFICATE / AFFIDAVIT OF SERVICE / NON-SERVICE

OFFICER CERTIFICATE      OR      AFFIDAVIT OF PROCESS SERVER

☐ I served personally a copy of the summons and complaint,
☐ I served by registered or certified mail (copy of return receipt attached) a copy of the summons and complaint,

together with
List all documents served with the Summons and Complaint

_____ on the defendant(s).

| Defendant's name | Complete address(es) of service | Day, date, time |
|---|---|---|
| | | |
| | | |

☐ After diligent search and inquiry, I have been unable to find and serve the following defendant(s):

_____

I have made the following efforts in attempting to serve the defendant(s): _____

I have personally attempted to serve the summons and complaint, together with _____
Attachment

The address was incorrect at the time of filing.

| Miles traveled | Mileage fee | Miles fee |
| | | |

| Signature |
| Title |

Subscribed and sworn to before me on _____ County, Michigan
Date

My commission expires: _____ Signature: _____
Date                                            Deputy court clerk/Notary public

## ACKNOWLEDGMENT OF SERVICE

I acknowledge that I have received service of the summons and complaint, together with    Court labels
Attachments

_____ on _____
Day, date, time

_____ on behalf of _____

Signature

STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE

LELAND HOUSE LIMITED
PARTNERSHIP COMPANY,
a Michigan Limited Partnership,

      Plaintiff,

vs.

                                Case No. 05-522445-CK

                                Hon. MICHAEL F. SAPALA

RAMADA FRANCHISE SYSTEMS, INC.,
a Delaware Corporation,

      Defendant.

_____/

WEISMAN, YOUNG, SCHLOSS & RUEMENAPP, P.C.
By:   Martin C. Weisman (P22139)
       Wilfred Eric Steiner (P58631)
Attorneys for Plaintiff
30100 Telegraph Road, Suite 428
Bingham Farms, MI 48025
Phone No.: (248) 258-2700
Fax No.: (248) 258-8927

## COMPLAINT

      There is no other civil action between these parties arising out of
the same transaction or occurrence as alleged in this complaint
pending in this Court, nor has any such action been previously
filed and dismissed or transferred after having been assigned to a
judge, nor do I know of any other civil action, not between these
parties, arising out of the same transaction or occurrence as alleged
in this complaint that is either pending or was previously filed and
dismissed, transferred, or otherwise disposed of after having been
assigned to a judge in this court.

      NOW COMES Plaintiff, Leland House Limited Partnership Company, by and through its

attorneys, Weisman, Young, Schloss & Ruemenapp, P.C. and for its Complaint says as follows:

     1.     Plaintiff Leland House Limited Partnership Company ("Leland") is a limited

partnership duly organized and in good standing under the laws of the State of Michigan, which operates a hotel located in the City of Detroit, County of Wayne, State of Michigan.

2.     Defendant Ramada Franchise Systems, Inc. ("Ramada") is a Delaware Corporation authorized to do business in the State of Michigan, and which does business in the County of Wayne, State of Michigan.

3.     In 1998, Plaintiff and Defendant entered into a Franchise Agreement (the "Agreement") which specified the duties and obligations of each party. See Agreement, attached hereto as Exhibit 1.

4.     Defendant breached this Agreement, or otherwise caused Plaintiff damage, as more specifically set forth below.

5.     Jurisdiction and venue properly lie in this Honorable Court.

## BACKGROUND FACTS

6.     In 2001, the City of Detroit was awarded the opportunity to host the National Football League's championship game in the calendar year 2006, to be called Super Bowl XL.

7.     Super Bowl XL is expected to provide approximately $300 million in economic spinoff to the City of Detroit and its businesses.

8.     February 5, 2006 was selected as the date for Super Bowl XL.

9.     Plaintiff operates a Ramada Inn hotel approximately six city blocks from Ford Field, the location of Super Bowl XL.

10.     The National Football League requires that 17,500 hotel rooms be available for their use during the week of the Super Bowl.

11.     At the Super Bowl held in Jacksonville, Florida in 2005, hotel rooms were offered at a minimum of three times the normal rate during the week of the Super Bowl.

2

12.    The demand for hotel rooms in Detroit was sizably increased over prior venues, due to the lack of existing hotels close to Ford Field.

## FACTS GIVING RISE TO INSTANT ACTION

13.    As with all specialized sporting events where the location is known in advance — such as the Ryder Cup (golf), the Olympics, and the Final Four (collegiate basketball) — hotel operators increase their rates significantly to capitalize upon demand, and many local hotels sell out well in advance even at the grossly inflated rates.

14.    Plaintiff was required to participate in Ramada's centralized reservation system ("CRS") pursuant to Paragraph 4.2 of the Agreement.

15.    The CRS does not allow reservations to be made more than 51 weeks prior to the reserved date.

16.    In light of both the overall increase in demand for rooms for Super Bowl XL, as well as the even greater attractiveness of Plaintiff's proximity to Ford Field, Plaintiff attempted to both raise its rates and block rooms for the entire Super Bowl week.

17.    Plaintiff repeatedly attempted to block the relevant dates through the host management system, but was unable to do so because of the software preventing blocking dates prior to 51 weeks before the date.

18.    On or around February 8, 2004, Plaintiff's General Manager, Cheryl Martin ("Martin") was contacted by an individual named Todd Cuthbert ("Cuthbert"), who informed the General Manager that he had booked eighty-one (81) rooms for February 3-5, 2006 online through Ramada's online reservation system the weekend of February 4, 2005.

19.    This was the first Martin had heard of any reservations for those dates, as the relevant dates were unable to be managed or booked due to the 51 week policy referenced above.

3

20.     Cuthbert, a ticket broker, informed Martin that he had been unable to reserve rooms either directly with the hotel, or through Ramada's toll free reservation phone number, but was able to reserve rooms through the online system in blocks of nine (9) each.

21.     Cuthbert received these mass reservations at the highly discounted "employee" or "management special" rate – with no premium for the date, or even at the regular "rack rate."

22.     Martin immediately contacted Ramada to inquire about these reservations, as the date should have been blocked, and the reservations do not appear in the system.

23.     Plaintiff was preliminarily informed that since Plaintiff did not close the dates "until 2-6-05" that the reservations were valid.

24.     On or around February 21, 2005, Plaintiff re-closed the relevant dates for at least the third time.

25.     As late as April 13, 2005, Cuthbert's reservations did not appear in the system.

26.     On or around February 24, 2005, Ramada informed Plaintiff that Cuthbert "confirmed reservations at your facility. Accordingly, the Facility will be required to honor the confirmed reservations."

27.     If Plaintiff is forced to honor these cause loss to Plaintiff in excess of $100,000.00, representing the difference between the price Cuthbert expects to pay and the going rate at the time.

28.     According to Ramada, on February 6, 2005, Linda Merlotti made reservations for eight rooms, for the dates of February 2-6, 2005, both online and over the internet – two under her name, three under Jason Merlotti, and three under the name Mary Ann Spann – all for the same, highly discounted "employee" or "management special" rate as Cuthbert.

29.     Despite Ramada claiming with respect to Cuthbert that Plaintiff had closed the

4

dates on "2-6-05", in this instance, where reservations were allegedly made on February 6, 2005, Ramada claimed that "CRS shows the hotel closed out these dates on 2/7."

30.    As with Cuthbert, Ramada has demanded that Plaintiff honor the reservations, costing Plaintiff damage.

31.    Ramada has breached the Agreement, whereby Ramada is attempting to force Plaintiff to suffer a massive financial loss due to Ramada error.

32.    Ramada has breached the Agreement by refusing to allow Plaintiff to set room rates in a manner consistent with Ramada policy.

33.    Due to Ramada's actions in erroneously accepting reservations, Ramada has placed Plaintiff in the unenviable position of either rejecting reservations made through Ramada-sanctioned means and facing likely litigation, or suffering a massive financial loss.

34.    Since these events, Plaintiff has withheld certain franchise fees from Ramada due to Ramada's breach of the Agreement.

35.    In further breach, Ramada subsequently removed Plaintiff from the CRS system, causing massive financial loss.

36.    Plaintiff seeks a declaration that Ramada has breached the Agreement, as well as monetary damages.

## COUNT I – BREACH OF FRANCHISE AGREEMENT

37.    Plaintiff restates and realleges the allegations contained in Paragraphs 1-37, as if fully set forth herein.

38.    Plaintiff and Defendant had a valid contract governing each party's conduct.

39.    Defendant breached the Agreement by failing to provide services through CRS in a reasonable manner.

5

40.     Defendant breached the Agreement by failing to cure the default within a reasonable time after written notice.

41.     Defendant's breach of the Agreement caused Plaintiff significant monetary damage.

42.     Defendant's breach of the Agreement entitles Plaintiff to declare the Agreement terminated without remedy to Defendant.

WHEREFORE, Plaintiff respectfully requests this Honorable Court enter a Judgment in favor of Plaintiff and against Defendant in an amount to exceed $25,000.00 for Defendant's breach of contract, award Plaintiff exemplary, special and compensatory damages, award attorney fees and costs as specified in the contract, and order such other and further relief as this Court deems equitable and just.

## COUNT II – PROMISSORY ESTOPPEL

43.     Plaintiff restates and realleges the allegations contained in Paragraphs 1-42, as if fully set forth herein.

44.     Defendant mandates that Plaintiff utilize a centralized reservation system ("CRS") maintained and operated by Defendant for the purposes of securing reservations at the hotel.

45.     Defendant allows customers to contact CRS directly, either through the use of a toll free national phone number or via an internet portal for the purposes of accepting reservations.

46.     Defendant allows franchisors to "block" or "close" certain valuable dates through CRS in advance.

47.     Plaintiff blocked the dates surrounding Super Bowl XL.

48.     Plaintiff relied on CRS procedure to ensure that the hotel would be protected

6

against the inevitable ticket and vacation-brokers seeking to obtain unfair, artificially reduced rates for Super Bowl XL.

49. Customers reserved over eighty-nine (89) rooms at Plaintiff through CRS, over Plaintiff's "block" order at these reduced rates.

50. Plaintiff relied on CRS procedure to its detriment.

51. Defendant is estopped from denying Plaintiff the ability to rely upon proper CRS procedure, which would have prevented the customers at issue from booking the rooms.

52. Defendant has informed Plaintiff that it must honor the improperly granted reservations.

53. Defendant is liable to pay Plaintiff the difference between the price of the rooms improperly booked through CRS and the value for which Plaintiff would have otherwise received for those rooms, due to Defendant's conduct.

WHEREFORE, Plaintiff respectfully requests this Honorable Court enter a Judgment in favor of Plaintiff and against Defendant in an amount to exceed $25,000.00 for Defendant's breach of contract, award Plaintiff exemplary, special and compensatory damages, award attorney fees and costs as specified in the contract, and order such other and further relief as the Court deems equitable and just.

## COUNT III- DECLARATORY ACTION

54. Plaintiff restates and realleges the allegations contained in Paragraphs 1-53 as if fully set forth herein.

55. Plaintiff and Defendant have a valid contract.

56. Defendant breached that contract by failing to follow its internal procedures, and by failing to cure the default within a reasonable time after being notified in writing of the

default.

57.   Plaintiff has the right to declare the contract terminated due to the prior breach of Defendant.

58.   Plaintiff has the right to seek a judicial determination that Plaintiff can terminate the Agreement due to the prior breach of Defendant.

WHEREFORE, Plaintiff respectfully requests this Honorable Court enter an Order stating that the Agreement between Plaintiff and Defendant is terminated, grant Plaintiff damages in an amount to exceed $25,000.00 for Defendant's conduct, award Plaintiff exemplary, special and compensatory damages, attorney fees and costs as specified in the contract, and order such other and further relief as this Court deems equitable and just.

WEISMAN, YOUNG, SCHLOSS & RUEMENAPP, P.C.

By: _____
      Martin C. Weisman (P22139)
      Wilfred Eric Steiner (P58631)
Attorneys for Plaintiff
30100 Telegraph Road, Suite 428
Bingham Farms, MI 48025
Telephone No.:  (248) 258-2700
Facsimile No.:  (248) 258-8927

Dated: _July 29_, 2005

F:\CLIENTS\L\Leland House 6163-\Ramada Franchise Systems -6215\Complaint.doc

8

Location:    Detroit, Michigan
Entity No.    86170
Unit No.:    617

## RAMADA FRANCHISE SYSTEMS, INC.
## LICENSE AGREEMENT

THIS LICENSE AGREEMENT ("Agreement"), dated July 30, 1998, is between RAMADA FRANCHISE SYSTEMS, INC., a Delaware corporation ("we", "our" or "us"), and LELAND HOUSE LIMITED PARTNERSHIP COMPANY, a Michigan limited partnership ("you"). The definitions of capitalized terms are found in Appendix A. In consideration of the following mutual promises, the parties agree as follows:

This transaction represents the renewal of the License for an existing Chain Facility first granted to you in a License Agreement dated July 29, 1988 (the "Prior Agreement"). You must perform any and all of your obligations (financial and otherwise) under the Prior Agreement remaining as of the date of this Agreement and correct any uncured defaults, other than as expressly superseded by this Agreement.

1. **License.** We acquired from Franchise Systems Holdings, Inc. ("FSH") pursuant to the Master License Agreements the right to use and to sublicense certain trade names, trademarks and service marks including the Marks and the distinctive Ramada System for providing transient guest lodging services to the public under the "RAMADA" name and certain services to its licensees, including the Reservation System, advertising, marketing and training services. We have the exclusive right to license and franchise to you the distinctive "Ramada" System for providing transient guest lodging services. We grant to you and you accept the License, effective and commencing on the Opening Date and ending on the earliest to occur of the Term's expiration or a Termination. You will call the Facility a "Ramada ." You may adopt additional or secondary designations for the Facility with our prior written consent, which we may withhold, condition, or withdraw on written notice in our sole discretion.

2. **Ramada Inns National Association.**

2.1 **Membership.** You automatically become a member of the Ramada Inns National Association ("RINA"), an unincorporated association. Other Chain licensees are also members of RINA. RINA may consider and discuss common issues relating to advertising and operation of facilities in the System and, through its Executive Committee, make recommendations to us regarding such issues and other matters.

2.2 **Annual Conference.** A RINA conference is held each year. The conference date and location will be determined by the RINA Executive Committee after consultation with us. You will pay not less than one "Conference Registration Fee" for each Facility you own. When you pay the Conference Registration Fee, you may send your representative to the conference. Additional Facility representatives may attend subject to conference policies and after payment of an additional

RAEXHCI 2/98

1

Conference Registration Fee for each such additional attendee.   You will pay the costs of transportation, lodging and meals (except those we provide as part of the Conference) for your attendees.

**3.  Your Improvement and Operating Obligations.**  Your obligations to improve, operate and maintain the Facility are:

**3.1  Improvements.**  You must select and acquire the Location and acquire, equip and supply the Facility in accordance with System Standards for entering conversion facilities. You must begin improvement of the Facility no later than thirty (30) days after the Effective Date.  The Facility must score 400 points (or equivalent) within ninety (90) days after the Effective Date and 425 points (or equivalent) within nine months after the Effective Date. All improvements will comply with System Standards, any Approved Plans, Schedule B and any Punch List attached to this Agreement.   Your general contractor or you must carry the insurance required under this Agreement during renovation.   If you do not commence or complete the improvement of the Facility by the dates specified in this Section 3.1, or the Facility does not meet the post-transfer quality assurance inspection standard, or complete the post-transfer improvements specified in the Punch List after the Effective Date, then we may, in our sole discretion, terminate this Agreement by giving written notice to you.  Time is of the essence for the Improvement Obligation.  We may, however, in our sole discretion, grant one or more extensions of time to perform the Improvement Obligation.  The grant of an extension will not waive any other default existing at the time the extension is granted.

**3.2  Improvement Plans.**  You will create plans and specifications for the work described in Section 3.1 (based upon the System Standards and this Agreement) if we so request and submit them for our approval before starting improvement of the Location.  We will not unreasonably withhold or delay our approval, which is intended only to test compliance with System Standards, and not to detect errors or omissions in the work of your architects, engineers, contractors or the like.  Our review does not cover technical, architectural or engineering factors, or compliance with federal, state or local laws, regulations or code requirements.  We will not be liable to your lenders, contractors, employees, guests, others or you on account of our review or approval of your plans, drawings or specifications, or our inspection of the Facility before, during or after renovation or construction.  Any material variation from the Approved Plans requires our prior written approval.  You will promptly provide us with copies of permits, job progress reports, and other information as we may reasonably request. We may inspect the work while in progress without prior notice.

**3.3  Opening.**  You may continue to identify the Facility as part of the System prior to completing the Improvement Obligation.

**3.4  Operation.**  You will operate and maintain the Facility continuously after the Opening Date on a year-round basis as required by System Standards and offer transient guest lodging and other related services of the Facility (including those specified on Schedule B) to the public in compliance with the law and System Standards.  You will keep the Facility in a clean, neat, and sanitary condition.  You will clean, repair, replace, renovate, refurbish, paint, and redecorate the Facility and its FF&E as and when needed to comply with System Standards. The Facility will be

managed by either a management company or an individual manager with significant training and experience in general management of similar lodging facilities. The Facility will accept payment from guests by all credit and debit cards we designate in the System Standards Manual. You may add to or discontinue the amenities, services and facilities described in Schedule B, or lease or subcontract any service or portion of the Facility, only with our prior written consent which we will not unreasonably withhold or delay. Your front desk operation, telephone system, parking lot, swimming pool and other guest service facilities may not be shared with or used by guests of another lodging or housing facility.

3.5  **Training.**  You (or a person with executive authority if you are an entity) and the Facility's general manager will attend the training programs described in Section 4.1 we designate as mandatory for licensees or general managers, respectively.  You will train or cause the training of all Facility personnel as and when required by System Standards and this Agreement.  You will pay for all travel, lodging, meals and compensation expenses of the people you send for training programs, the cost of training materials and other reasonable charges we may impose for training under Section 4.1, and all travel, lodging, meal and facility and equipment rental expenses of our representatives if training is provided at the Facility.

3.6  **Marketing.**  You will participate in System marketing programs, including the Directory and the Reservation System.  You will obtain and maintain the computer and communications service and equipment we specify to participate in the Reservation System.  You will comply with our rules and standards for participation, and will honor reservations and commitments to guests and travel industry participants.  You may implement, at your option and expense, your own local advertising.  Your advertising materials must use the Marks correctly, and must comply with System Standards or be approved in writing by us prior to publication.  You will stop using any non-conforming, out-dated or misleading advertising materials if we so request.  3.6.1 You will participate in any regional marketing, training or management alliance or cooperative of Chain licensees formed to serve the Chain Facilities in your area.  We may assist the cooperative collect contributions.  You may be excluded from cooperative programs and benefits if you don't participate in all cooperative programs according to their terms, including making payments and contributions when due.

3.7  **Governmental Matters.**  You will obtain as and when needed all governmental permits, licenses and consents required by law to construct, acquire, renovate, operate and maintain the Facility and to offer all services you advertise or promote.  You will pay when due or properly contest all federal, state and local payroll, withholding, unemployment, beverage, permit, license, property, ad valorem and other taxes, assessments, fees, charges, penalties and interest, and will file when due all governmental returns, notices and other filings.

3.8  **Inspections and Audits.**  You will permit our representatives to perform quality assurance inspections of the Facility and audit your financial and operating books and records (including tax returns) particularly those relating to the Facility and any related business, with or without prior notice of the inspection or audit.  The inspections and audits will commence during normal business hours, although we may observe Facility operation and accounting activity at any time.

You, the Facility staff and your other agents and employees will cooperate with our inspectors and auditors in the performance of their duties.. You will pay us any underpayment of, and we will pay you or credit your Recurring Fee account for any overpayment of, Recurring Fees discovered by an audit. If the Facility does not pass an inspection, you refuse to cooperate with our inspectors or our auditors when they arrive for an audit at a time scheduled at least 3 business days in advance or the audit reveals that you paid us less than 97% of the correct amount of Recurring Fees for a fiscal year or longer, you will pay us the Audit Fee described in Section 4.8, or the reasonable costs of travel, lodging and meal expenses for reinspection and any reinspection fee we may impose. We may publish or disclose the results of quality assurance inspections.

3.9  **Reports and Accounting.**  You will prepare and submit timely monthly reports containing the information we require about the Facility's performance during the preceding month. You will prepare and submit other reports and information about the Facility as we may reasonably request from time to time or in the System Standards Manual. You will prepare and maintain any reports required under the System Standards Manual in the Facility's property management or reservation computer system, including the name and address of Facility guests, if collected, and send them to us or allow us to access them by means of a telephone datalink. You will allow us access to the reports and data stored on the Facility's property management or reservation computer system via telephone, provided that we will not unreasonably interfere with normal functioning of the property management or reservation computer system. You will maintain accounting books and records in accordance with generally accepted accounting principles and the American Hotel & Motel Association Uniform System of Accounts for Hotels, as amended, subject to this Agreement and other reasonable accounting standards we may specify from time to time. You will prepare and submit to us if we so request your annual and semi-annual financial statements. We do not require that your financial statements be independently audited, but you will send us a copy of your audited statements if you have them audited and we ask for them.

3.10  **Insurance.**  You will obtain and maintain during the Term of this Agreement the insurance coverage required under the System Standards Manual from insurers meeting the standards established in the Manual.  Unless we instruct you otherwise, your liability insurance policies will name Ramada Franchise Systems, Inc. and Cendant Corporation, its successors and assigns as additional insureds.

3.11  **Conferences.**  You or your representative will attend each annual RINA conference and pay the Conference Registration Fee described in Section 2.2. Mandatory recurrent training for licensees and general managers described in Section 4.1.3 may be held at a RINA conference. The Fee will be the same for all Chain Facilities that we license in the United States. You will receive reasonable notice of a Chain conference.

3.12  **Purchasing.**  You will purchase or obtain certain items we designate as proprietary or that bear Marks, such as signage, only from suppliers we approve.  You may purchase any other items for the Facility from any competent source you select, so long as the items meet or exceed System Standards.

RAEXHCI 2/98

**3.13   Good Will.**   You will use reasonable efforts to protect, maintain and promote the name "Ramada" and its distinguishing characteristics, and the other Marks. You will not permit or allow your officers, directors, principals, employees, representatives, or guests of the Facility to engage in conduct which is unlawful or damaging to the good will or public image of the Chain or System. You will participate in Chain-wide guest service and satisfaction guaranty programs we require in good faith for all Chain Facilities. You will follow System Standards for identification of the Facility and for you to avoid confusion on the part of guests, creditors, lenders, investors and the public as to your ownership and operation of the Facility, and the identity of your owners.

**3.14   Facility Modifications.**   You may materially modify, diminish or expand the Facility (or change its interior design, layout, FF&E, or facilities) only after you receive our prior written consent, which we will not unreasonably withhold or delay. You will pay our Rooms Addition Fee then in effect for each guest room you add to the Facility. If we so request, you will obtain our prior written approval of the plans and specifications for any material modification, which we will not unreasonably withhold or delay.   You will not open to the public any material modification until we inspect it for compliance with the Approved Plans and System Standards.

**3.15   Courtesy Lodging.**   You will provide lodging at the "Employee Rate" established in the System Standards Manual from time to time (but only to the extent that adequate room vacancies exist) to our representatives traveling on business, but not more than three standard guest rooms at the same time.

**3.16   Minor Renovations.**   Beginning three years after the Opening Date, we may issue a "Minor Renovation Notice" to you that will specify reasonable Facility upgrading and renovation requirements (a "Minor Renovation") to be commenced no sooner than 60 days after the notice is issued, having an aggregate cost for labor, FF&E and materials estimated by us to be not more than the Minor Renovation Ceiling Amount.   You will perform the Minor Renovations as and when the Minor Renovation Notice requires. We will not issue a Minor Renovation Notice within three years after the date of a prior Minor Renovation Notice, or if the three most recent quality assurance inspection scores of the Facility averaged at least 425 points or equivalent and the most recent quality assurance inspection score for the Facility was at least 400 points or equivalent when the Facility is otherwise eligible for a Minor Renovation.

**4.   Our Operating and Service Obligations.**   We will provide you with the following services and assistance:

**4.1   Training.**   We will offer general manager training, property opening, recurrent training and supplemental training.

**4.1.1   Management Training.**   Between 60 days before and three months after the projected Opening Date, we will offer at a location in the United States we designate, and the Facility general manager must complete a training program to our satisfaction. The training program will not exceed two weeks in duration and will cover such topics as System Standards, services available from us, and operating a Chain Facility. We may charge you a reasonable fee for materials for each manager trainee. Each manager's training program may vary depending on his or her prior training

and experience. Any replacement general manager of the Facility must complete the training program within the time specified in the System Standards Manual. No tuition will be charged for your first participation in this training but you must pay for your representative's travel, lodging, meals, incidental expenses, compensation and benefits. We may charge you reasonable tuition for training for replacement managers.

**4.1.2 Property Opening Training.** We will provide at the Facility or another agreed location a "Property Training Program" (at our discretion as to length and scheduling) to assist you in opening the Facility. There is no charge for the Property Training Program other than for the reasonable expenses for travel, room, board and other out-of-pocket costs of our representatives.

**4.1.3 Recurrent Training.** We will provide training for you and the Facility's managers if we determine that additional training for licensees and managers is necessary from time to time. Training will be held in our U.S. training center or other locations, or in conjunction with regional workshops or conferences. You will pay for your representative's travel, lodging, meals, incidental expenses, compensation and benefits for this training. We may charge reasonable tuition for refresher courses and regional workshops. This training may be held in conjunction with a Chain conference.

**4.1.4 Supplemental Training.** We may offer optional training programs without charge or for tuition. We may offer or sell to you video tapes, computer discs or other on-site training aids and materials, or require you to buy them at reasonable prices.

**4.1.5** We may charge you a reasonable cancellation fee if you cancel your training program commitments or reservations within 30 days (or such shorter period as we may specify) before the start of any training program at which you or your representative has a reservation. We may charge you tuition for your representatives to attend mandatory sessions other than those people we require to attend the training and fees for instructional materials.

**4.2 Reservation System.** We will operate and maintain (directly or by subcontracting with an affiliate or one or more third parties), with funds allocated from the collections of the RINA Services Assessment Fees, a computerized Reservation System or such technological substitutes as we determine, in our discretion. We will use the allocated RINA Services Assessment Fees for the acquisition, development, support, equipping, maintenance, improvement and operation of the Reservation System. We will provide software maintenance for the software we license to you to connect to the Reservation System if your Recurring Fee payments are up to date. The Facility will participate in the Reservation System, commencing with the Opening Date for the balance of the Term. We have the right to provide reservation services to lodging facilities other than Chain Facilities or to other parties. We will not offer callers to our general consumer toll free reservation telephone number in the United States the opportunity to make reservations for other lodging chains.

### 4.3  Marketing.

4.3.1  We will promote public awareness and usage of Chain Facilities with funds allocated from collections of the RINA Services Assessment Fees by implementing advertising, promotion, publicity, market research and other marketing programs, training programs and related activities, and the production and distribution of Chain publications and directories of hotels. We will determine in our discretion: (i) The nature and type of media placement; (ii) The allocation (if any) among international, national, regional and local markets; and (iii) The nature and type of advertising copy, other materials and programs. We or an affiliate may be reimbursed for the reasonable direct and indirect costs, overhead or other expenses of providing marketing services. We are not obligated to supplement or advance funds available from collections of the RINA Services Assessment Fees to pay for marketing activities. We do not promise that the Facility or you will benefit directly or proportionately from marketing activities.

4.3.2  We may, at our discretion, implement special international, national, regional or local promotional programs (which may or may not include the Facility) and may make available to you (to use at your option) media advertising copy and other marketing materials for prices which reasonably cover the materials' direct and indirect costs.

4.3.3  We will publish the Chain Directory. We will include the Facility in the Chain Directory after it opens if you submit the information we request on time, and you are not in default under this Agreement at the time we must arrange for publication. We will supply Directories to you for display at locations specified in the System Standards Manual or policy statements. We may assess you a reasonable charge for the direct and indirect expenses (including overhead) of producing and delivering the Directories.

4.4  **Purchasing.** We may offer optional assistance to you with purchasing items used at or in the Facility. Our affiliates may offer this service on our behalf. We may restrict the vendors authorized to sell proprietary or Mark-bearing items in order to control quality, provide for consistent service or obtain volume discounts. We will maintain and provide to you lists of suppliers approved to furnish Mark-bearing items, or whose products conform to System Standards.

4.5  **The System.** We will control and establish requirements for all aspects of the System. We may, in our discretion, change, delete from or add to the System, including any of the Marks or System Standards, in response to changing market conditions. We may, in our discretion, permit deviations from System Standards, based on local conditions and our assessment of the circumstances.

4.6  **Consultations and Standards Compliance.** We will assist you to understand your obligations under System Standards by telephone, mail, during quality assurance inspections, through the System Standards Manual, at training sessions and during conferences and meetings we conduct. We will provide telephone and mail consultation on Facility operation and marketing through our representatives.

RAEXHC1 2/98

7

4.7 System Standards Manual and Other Publications. We will specify System Standards in the System Standards Manual, policy statements or other publications. We will lend you one copy of the System Standards Manual promptly after we sign this Agreement. We will send you any System Standards Manual revisions and/or supplements as and when issued. We will send you all other publications for Chain licensees and all separate policy statements in effect from time to time.

4.8 Inspections and Audits. We have the unlimited right to conduct unannounced quality assurance inspections of the Facility and its operations, records and Mark usage to test the Facility's compliance with System Standards and this Agreement, and the audits described in Section 3.8. We have the unlimited right to reinspect if the Facility does not achieve the score required on an inspection. We may impose a reinspection fee and will charge you for our costs as provided in Section 3.8. You will pay us an "Audit Fee" of $300.00 when we invoice you for an Audit Fee under Section 3.8. We may increase the Audit Fee on a Chain-wide basis to cover any increases in our audit costs to not more than $500.00, effective any time after December 31, 2005. Our inspections are solely for the purposes of checking compliance with System Standards.

5. Term. The Term begins on the Effective Date and expires on the day prior to the fifteenth anniversary of the Opening Date. Some of your duties and obligations will survive termination or expiration of this Agreement. You will execute and deliver to us with this Agreement a notarized Declaration of License Agreement in recordable form. We will countersign and return one copy of the Declaration to you. We may, at our option, record the Declaration in the real property records of the county where the Facility is located. The Declaration will be released at your request and expense when this Agreement terminates or expires and you perform your post-termination obligations. NEITHER PARTY HAS RENEWAL RIGHTS OR OPTIONS.

6. Application and Initial Fees. Your Application and Initial Fees have been waived.

7. Recurring Fees, Taxes and Interest.

7.1     You will pay us certain "Recurring Fees" in U.S. dollars (or such other currency as we may direct if the Facility is outside the United States) fifteen days after the month in which they accrue, without billing or demand. Recurring Fees include the following:

7.1.1 A "Royalty" equal to four percent (4.0%) of Gross Room Revenues of the Facility accruing during the calendar month, accrues from the earlier of the Opening Date or the date you identify the Facility as a Chain Facility or operate it under a Mark until the end of the Term.

7.1.2 A "RINA Services Assessment Fee" as set forth in Schedule C for advertising, marketing, training, the Reservation System and other related services and programs, accrues from the Opening Date until the end of the Term, including during suspension periods. On behalf of RINA, we collect and deposit the Fees from licensees, then disburse and administer the funds collected by means of a separate account or accounts. The RINA Services Assessment Fee is subject to change for all Chain Facilities, and new fees and charges may be assessed for new services, by substituting a new Schedule C or otherwise, but only upon the recommendation of the RINA Executive Committee and after our approval. You will also pay or reimburse us for travel and other agent

RAEXHCI 2/98

8

commissions paid for certain reservations at the Facility and a "GDS Fee" levied to pay for reservations for the Facility originated or processed through the Global Distribution System, the Internet and other reservation systems and networks. We may charge a reasonable service fee for this service. We may charge Facilities using the Reservation System outside the United States for reservation service using a different formula. We may use the RINA Services Assessment Fees we collect, in whole or in part, to reimburse our reasonable direct and indirect costs, overhead or other expenses of providing marketing, training and reservation services.

7.2     You will pay to us "Taxes" equal to any federal, state or local sales, gross receipts, use, value added, excise or similar taxes assessed against us on the Recurring Fees by the jurisdictions where the Facility is located, but not including any income tax, franchise or other tax for the privilege of doing business by us in your State. You will pay Taxes to us when due.

7.3     "Interest" is payable when you receive our invoice on any past due amount payable to us under this Agreement at the rate of 1.5% per month or the maximum rate permitted by applicable law, whichever is less, accruing from the due date until the amount is paid.

7.4     If a transfer occurs, your transferee or you will pay us our then current Application Fee and a "Relicense Fee" equal to the Initial Fee we would then charge a new licensee for the Facility.

8.  Indemnifications.

8.1  Independent of your obligation to procure and maintain insurance, you will indemnify, defend and hold the Indemnitees harmless, to the fullest extent permitted by law, from and against all Losses and Expenses, incurred by any Indemnitee for any investigation, claim, action, suit, demand, administrative or alternative dispute resolution proceeding, relating to or arising out of any transaction, occurrence or service at, or involving the operation of, the Facility, any breach or violation of any contract or any law, regulation or ruling by, or any act, error or omission (active or passive) of, you, any party associated or affiliated with you or any of the owners, officers, directors, employees, agents or contractors of you or your affiliates, including when you are alleged or held to be the actual, apparent or ostensible agent of the Indemnitee, or the active or passive negligence of any Indemnitee is alleged or proven. You have no obligation to indemnify an Indemnitee for damages to compensate for property damage or personal injury if a court of competent jurisdiction makes a final decision not subject to further appeal that the Indemnitee engaged in willful misconduct or intentionally caused such property damage or bodily injury. This exclusion from the obligation to indemnify shall not, however, apply if the property damage or bodily injury resulted from the use of reasonable force by the Indemnitee to protect persons or property.

8.2  You will respond promptly to any matter described in the preceding paragraph, and defend the Indemnitee. You will reimburse the Indemnitee for all costs of defending the matter, including reasonable attorneys' fees, incurred by the Indemnitee if your insurer or you do not assume defense of the Indemnitee promptly when requested, or separate counsel is appropriate, in our discretion, because of actual or potential conflicts of interest. We must approve any resolution or course of action in a matter that could directly or indirectly have any adverse effect on us or the Chain, or could serve as a precedent for other matters.

RAEXHC1 2/98

9

8.3  We will indemnify, defend and hold you harmless, to the fullest extent permitted by law, from and against all Losses and Expenses incurred by you in any action or claim arising from your proper use of the System alleging that your use of the System and any property we license to you is an infringement of a third party's rights to any trade secret, patent, copyright, trademark, service mark or trade name.  You will promptly notify us in writing when you become aware of any alleged infringement or an action is filed against you.  You will cooperate with our defense and resolution of the claim.  We may resolve the matter by obtaining a license of the property for you at our expense, or by requiring that you discontinue using the infringing property or modify your use to avoid infringing the rights of others.

## 9.  Your Assignments, Transfers and Conveyances.

9.1  **Transfer of the Facility.**  This Agreement is personal to you (and your owners if you are an entity).  We are relying on your experience, skill and financial resources (and that of your owners and the guarantors, if any) to sign this Agreement with you.  You may finance the Facility and grant a lien, security interest or encumbrance on it without notice to us or our consent.  If a Transfer is to occur, the transferee or you must comply with Section 9.3.  Your License is subject to termination when the Transfer occurs.  The License is not transferable to your transferee, who has no right or authorization to use the System and the Marks when you transfer ownership or possession of the Facility.  The transferee may not operate the Facility under the System, and you are responsible for performing the post-termination obligations in Section 13.  You and your owners may, only with our prior written consent and after you comply with Sections 9.3 and 9.6, assign, pledge, transfer, delegate or grant a security interest in all or any of your rights, benefits and obligations under this Agreement, as security or otherwise.  Transactions involving Equity Interests that are not Equity Transfers do not require our consent and are not Transfers.

9.2  **Public Offerings and Registered Securities.**  You may engage the first registered public offering of your Equity Interests only after you pay us a public offering fee equal to $15,000.  Your Equity Interests (or those of a person, parent, subsidiary, sibling or affiliate entity, directly or indirectly effectively controlling you), are freely transferable without the application of this Section if they are, on the Effective Date, or after the public offering fee is paid, they become, registered under the federal Securities Act of 1933, as amended, or a class of securities registered under the Securities Exchange Act of 1934, as amended, or listed for trading on a national securities exchange or the automated quotation system of the National Association of Securities Dealers, Inc. (or any successor system), provided that any tender offer for at least a majority of your Equity Interests will be an Equity Transfer subject to Section 9.1.

9.3  **Conditions.**  We may, to the extent permitted by applicable law, condition and withhold our consent to a Transfer when required under this Section 9 until the transferee and you meet certain conditions.  If a Transfer is to occur, the transferee (or you, if an Equity Transfer is involved) must first complete and submit our Application, qualify to be a licensee in our sole discretion, given the circumstances of the proposed Transfer, provide the same supporting documents as a new license applicant, pay the Application and Relicense Fees then in effect, sign the form of License Agreement we then offer in conversion transactions and agree to renovate the Facility as if it were

RAEXHCI 2/98

an existing facility of similar age and condition converting to the System, as we reasonably determine. We will provide a Punch List of improvements we will require after the transferee's Application is submitted to us. We must also receive general releases from you and each of your owners, and payment of all amounts then owed to us and our affiliates by you, your owners, your affiliates, the transferee, its owners and affiliates, under this Agreement or otherwise. Our consent to the transaction will not be effective until these conditions are satisfied.

9.4 **Permitted Transferee Transactions.** You may transfer an Equity Interest or effect an Equity Transfer to a Permitted Transferee without obtaining our consent, renovating the Facility or paying a Relicense Fee or Application Fee. No Transfer will be deemed to occur. You also must not be in default and you must comply with the application and notice procedures specified in Sections 9.5 and 9.6. Each Permitted Transferee must first agree in writing to be bound by this Agreement, or at our option, execute the License Agreement form then offered prospective licensees. No transfer to a Permitted Transferee shall release a living transferor from liability under this Agreement or any guarantor under any Guaranty of this Agreement. You must comply with this Section if you transfer the Facility to a Permitted Transferee. A transfer resulting from a death may occur even if you are in default under this Agreement.

9.5 **Attempted Transfers.** Any transaction requiring our consent under this Section 9 to which our consent is not first obtained shall be void, as between you and us. You will continue to be liable for payment and performance of your obligations under this Agreement until we terminate this Agreement, all your financial obligations to us are paid and all System identification is removed from the Facility.

9.6 **Notice of Transfers.** You will give us at least 30 days prior written notice of any proposed Transfer or Permitted Transferee transaction. You will notify us when you sign a contract to Transfer the Facility and 10 days before you intend to close on the transfer of the Facility. We will respond to all requests for our consent and notices of Permitted Transferee transactions within a reasonable time not to exceed 30 days. You will notify us in writing within 30 days after a change in ownership of 25% or more of your Equity Interests that are not publicly held or that is not an Equity Transfer, or a change in the ownership of the Facility if you are not its owner. You will provide us with lists of the names, addresses, and ownership percentages of your owner(s) at our request.

10. **Our Assignments.** We may assign, delegate or subcontract all or any part of our rights and duties under this Agreement, including by operation of law, without notice and without your consent. We will have no obligations to you after you are notified that our transferee has assumed our obligations under this Agreement except those that arose before we assign this Agreement.

## 11. Default and Termination.

11.1  **Default.**  In addition to the matters identified in Section 3.1, you will be in default under this Agreement if (a) you do not pay us when a payment is due, (b) you do not perform any of your other obligations when this Agreement and the System Standards Manual require, or (c) if you otherwise breach this Agreement.  If your default is not cured within ten days after you receive written notice from us that you have not filed your monthly report, paid us any amount that is due or breached your obligations regarding Confidential Information, or within 30 days after you receive written notice from us of any other default (except as noted below), then we may terminate this Agreement by written notice to you, under Section 11.2.  We will not exercise our right to terminate if you have completely cured your default, or until any waiting period required by law has elapsed.  In the case of quality assurance default, if you have acted diligently to cure the default but cannot do so and have entered into a written improvement agreement with us within 90 days after the failing inspection, you may cure the default within 90 days after the failing inspection.  We may terminate the License if you do not perform that improvement agreement.

11.2  **Termination.**  We may terminate the License, or this Agreement if the Opening Date has not occurred, effective when we send written notice to you or such later date as required by law or as stated in the default notice, when (1) you do not cure a default as provided in Section 11.1 or we are authorized to terminate under Section 3.1, (2) you discontinue operating the Facility as a "Ramada", (3) you do or perform, directly or indirectly, any act or failure to act that in our reasonable judgment is or could be injurious or prejudicial to the goodwill associated with the Marks or the System, (4) you lose possession or the right to possession of the Facility, (5) you (or any guarantor) suffer the termination of another license or franchise agreement with us or one of our affiliates, (6) you intentionally maintain false books and records or submit a materially false report to us, (7) you (or any guarantor) generally fail to pay debts as they come due in the ordinary course of business, (8) you, any guarantor or any of your owners or agents misstated to us or omitted to tell us a material fact to obtain or maintain this Agreement with us, (9) you receive two or more notices of default from us in any one year period (whether or not you cure the defaults), (10) a violation of Section 9 occurs, or a Transfer occurs before the relicensing process is completed, (11) you or any of your Equity Interest owners contest in court the ownership or right to franchise or license all or any part of the System or the validity of any of the Marks, (12) you, any guarantor or the Facility is subject to any voluntary or involuntary bankruptcy, liquidation, dissolution, receivership, assignment, reorganization, moratorium, composition or a similar action or proceeding that is not dismissed within 60 days after its filing, or (13) you maintain or operate the Facility in a manner that endangers the health or safety of the Facility's guests.

## 11.3  Casualty and Condemnation.

11.3.1  You will notify us promptly after the Facility suffers a Casualty that prevents you from operating in the normal course of business, with less than 75% of guest rooms available.  You will give us information on the availability of guest rooms and the Facility's ability to honor advance reservations.  You will tell us in writing within 60 days after the Casualty whether or not you will restore, rebuild and refurbish the Facility to conform to System Standards and its condition prior to

the Casualty.  This restoration will be completed within 180 days after the Casualty.  You may decide within the 60 days after the Casualty, and if we do not hear from you, we will assume that you have decided, to terminate this Agreement, effective as of the date of your notice or 60 days after the Casualty, whichever comes first.  If this Agreement so terminates, you will pay all amounts accrued prior to termination and follow the post-termination requirements in Section 13. You will not be obligated to pay Liquidated Damages if the Facility will no longer be used as an extended stay or transient lodging facility after the Casualty.

11.3.2   You will notify us in writing within 10 days after you receive notice of any proposed Condemnation of the Facility, and within 10 days after receiving notice of the Condemnation date. This Agreement will terminate on the date the Facility or a substantial portion is conveyed to or taken over by the condemning authority.

**11.4  Our Other Remedies.**   We may suspend the Facility from the Reservation System for any default or failure to pay or perform under this Agreement, discontinue Reservation System referrals to the Facility for the duration of such suspension, and may divert previously made reservations to other Chain Facilities after giving notice of non-performance, non-payment or default.  All RINA Services Assessment Fees and related Reservation System user fees accrue during the suspension period.  We may deduct points under our quality assurance inspection program for your failure to comply with this Agreement or System Standards.  Reservation service will be restored after you have fully cured any and all defaults and failures to pay and perform.  We may omit the Facility from the Directory if you are in default on the date we must determine which Chain Facilities are included in the Directory.  You recognize that any use of the System not in accord with this Agreement will cause us irreparable harm for which there is no adequate remedy at law, entitling us to injunctive and other relief.  We may litigate to collect amounts due under this Agreement without first issuing a default or termination notice.  Our consent or approval may be withheld if needed while you are in default under this Agreement or may be conditioned on the cure of all your defaults.

**11.5  Your Remedies.**   If we fail to issue our approval or consent as and when required under this Agreement within a reasonable time of not less than 30 days after we receive all of the information we request, and you believe our refusal to approve or consent is wrongful, you may bring a legal action against us to compel us to issue our approval or consent to the obligation.  To the extent permitted by applicable law, this action shall be your exclusive remedy.   We shall not be responsible for direct, indirect, special, consequential or exemplary damages, including, but not limited to, lost profits or revenues.

## 12.  Liquidated Damages.

12.1  **Generally.**  If we terminate the License under Section 11.2, or you terminate this Agreement (except under Section 11.3 or as a result of our default which we do not cure within a reasonable time after written notice), you will pay us within 30 days following the date of termination, as Liquidated Damages, an amount equal to the sum of accrued Royalties and RINA Services Assessment Fees during the immediately preceding 24 full calendar months (or the number of months remaining in the unexpired Term at the date of termination, whichever is less).  If the

Facility has been open for less than 24 months, then the amount shall be the average monthly Royalties and RINA Services Assessment Fees since the Opening Date multiplied by 24. You will also pay any applicable Taxes assessed on such payment. Liquidated Damages will not be less than the product of $2,000.00 multiplied by the number of guest rooms in the Facility. If we terminate this Agreement under Section 3 before the Opening Date, you will pay us within 10 days after you receive our notice of termination Liquidated Damages equal to one-half the amount payable for termination under Section 11.2. Liquidated Damages are paid in place of our claims for lost future Recurring Fees under this Agreement.  Our right to receive other amounts due under this Agreement is not affected.

**12.2  Condemnation Payments.**  In the event a Condemnation is to occur, you will pay us the fees set forth in Section 7 for a period of one year after we receive the initial notice of condemnation described in Section 11.3.2, or until the Condemnation occurs, whichever is longer. You will pay us Liquidated Damages equal to the average daily Royalties and RINA Services Assessment Fees for the one year period preceding the date of your condemnation notice to us multiplied by the number of days remaining in the one year notice period if the Condemnation is completed before the one year notice period expires. This payment will be made within 30 days after Condemnation is completed (when you close the Facility or you deliver it to the condemning authority). You will pay no Liquidated Damages if the Condemnation is completed after the one year notice period expires, but the fees set forth in Section 7 must be paid when due until Condemnation is completed.

**13.   Your Duties At and After Termination.**  When the License or this Agreement terminates for any reason whatsoever:

**13.1  System Usage Ceases.**  You will immediately stop using the System to operate and identify the Facility. You will remove all signage and other items bearing any Marks and follow the other steps detailed in the System Standards Manual for changing the identification of the Facility. You will promptly paint over or remove the Facility's distinctive System trade dress, color schemes and architectural features.

**13.2    Other Duties.**  You will pay all amounts owed to us under this Agreement within 10 days after termination. You will owe us Recurring Fees on Gross Room Revenues accruing while the Facility is identified as a "Ramada", including the RINA Services Assessment Fees for so long as the Facility receives service from the Reservation System.  . We may immediately remove the Facility from the Reservation System and divert reservations as authorized in Section 11.4. We may also, to the extent permitted by applicable law, and without prior notice enter the Facility and any other parcels, remove software (including archive and back-up copies) for accessing the Reservation System, all copies of the System Standards Manual, Confidential Information, equipment and all other personal property of ours, and paint over or remove and purchase for $10.00, all or part of any interior or exterior Mark-bearing signage (or signage face plates), including billboards, whether or not located at the Facility, that you have not removed or obliterated within five days after termination. You will promptly pay or reimburse us for our cost of removing such items, net of the $10.00 purchase price for signage.  We will exercise reasonable care in removing or painting over signage. We will have no obligation or liability to restore the Facility to its condition prior to removing the signage. We shall have the right, but not the obligation, to

RAEXHC1 2/98

purchase some or all of the Facility's Mark-bearing FF&E and supplies at the lower of their cost or net book value, with the right to set off their aggregate purchase price against any sums then owed us by you.

13.3   **Advance Reservations.**  The Facility will honor any advance reservations, including group bookings, made for the Facility prior to termination at the rates and on the terms established when the reservations are made and pay when due all related travel agent commissions.

13.4   **Survival of Certain Provisions.**  Sections 3.8 (as to audits, for 2 years after termination), 3.9 (as to information relating to the Term, for 2 years after termination), 3.13, 7 (as to amounts accruing through termination), 8, 11.4, 12, 13, 15, 16 and 17 survive termination of the License and this Agreement, whether termination is initiated by you or us, even if termination is wrongful.

14.   <u>Your Representations and Warranties</u>.   You expressly represent and warrant to us as follows:

14.1    **Quiet Enjoyment and Financing.**   You own, or will own prior to commencing improvement, or lease, the Location and the Facility.  You will be entitled to possession of the Location and the Facility during the entire Term without restrictions that would interfere with your performance under this Agreement, subject to the reasonable requirements of any financing secured by the Facility.  You have, when you sign this Agreement, and will maintain during the Term, adequate financial liquidity and financial resources to perform your obligations under this Agreement.

14.2   **This Transaction.**  You have received, at least 10 business days prior to execution of this Agreement and making any payment to us, our current Uniform Franchise Offering Circular for prospective licensees.  Neither we nor any person acting on our behalf has made any oral or written representation or promise to you that is not written in this Agreement on which you are relying to enter into this Agreement.  You release any claim against us or our agents based on any oral or written representation or promise not stated in this Agreement.  You and the persons signing this Agreement for you have full power and authority and have been duly authorized, to enter into and perform or cause performance of your obligations under this Agreement.  You have obtained all necessary approvals of your owners, Board of Directors and lenders.  Your execution, delivery and performance of this Agreement will not violate, create a default under or breach of any charter, bylaws, agreement or other contract, license, permit, indebtedness, certificate, order, decree or security instrument to which you or any of your principal owners is a party or is subject or to which the Facility is subject.  Neither you nor the Facility is the subject of any current or pending merger, sale, dissolution, receivership, bankruptcy, foreclosure, reorganization, insolvency, or similar action or proceeding on the date you execute this Agreement and was not within the three years preceding such date, except as disclosed in the Application.  You will submit to us the documents about the Facility, you, your owners and your finances that we request in the License Application (or after our review of your initial submissions) before or within 30 days after you sign this Agreement.

RAEXJICI 2/98

15

14.3  **No Misrepresentations or Implied Covenants.**  All written information you submit to us about the Facility, you, your owners, any guarantor, or the finances of any such person or entity, was or will be at the time delivered and when you sign this Agreement, true, accurate and complete, and such information contains no misrepresentation of a material fact, and does not omit any material fact necessary to make the information disclosed not misleading under the circumstances. There are no express or implied covenants or warranties, oral or written, between we and you except as expressly stated in this Agreement.

## 15.  Proprietary Rights.

15.1  **Marks and System.**  You will not acquire any interest in or right to use the System or Marks except under this Agreement.  You will not apply for governmental registration of the Marks, or use the Marks or our corporate name in your legal name, but you may use a Mark for an assumed business or trade name filing.

15.2  **Inurements.**  All present and future distinguishing characteristics, improvements and additions to or associated with the System by us, you or others, and all present and future service marks, trademarks, copyrights, service mark and trademark registrations used and to be used as part of the System, and the associated good will, shall be our property and will inure to our benefit.  No good will shall attach to any secondary designator that you use.

15.3  **Other Locations and Systems.**  We and our affiliates each reserve the right to own, in whole or in part, and manage, operate, use, lease, finance, sublease, franchise, license (as licensor or licensee), provide services to or joint venture (i) distinctive separate lodging or food and beverage marks and other intellectual property which are not part of the System, and to enter into separate agreements with you or others (for separate charges) for use of any such other marks or proprietary rights, (ii) other lodging, food and beverage facilities, or businesses, under the System utilizing modified System Standards, and (iii) a Chain Facility at or for any location other than the Location.  There are no territorial rights or agreements between the parties.  You acknowledge that we are affiliated with or in the future may become affiliated with other lodging providers or franchise systems that operate under names or marks other than the Marks.  We and our affiliates may use or benefit from common hardware, software, communications equipment and services and administrative systems for reservations, franchise application procedures or committees, marketing and advertising programs, personnel, central purchasing, approved supplier lists, franchise sales personnel (or independent franchise sales representatives), etc.

15.4  **Confidential Information.**  You will take all appropriate actions to preserve the confidentiality of all Confidential Information.  Access to Confidential Information should be limited to persons who need the Confidential Information to perform their jobs and are subject to your general policy on maintaining confidentiality as a condition of employment or who have first signed a confidentiality agreement.  You will not permit copying of Confidential Information (including, as to computer software, any translation, decompiling, decoding, modification or other alteration of the source code of such software).  You will use Confidential Information only for the Facility and to perform under this Agreement.  Upon termination (or earlier, as we may request), you shall return to us all originals and copies of the System Standards Manual, policy statements

RAEXIICI 2/98

and Confidential Information "fixed in any tangible medium of expression," within the meaning of the U.S. Copyright Act, as amended. Your obligations under this subsection commence when you sign this Agreement and continue for trade secrets (including computer software we license to you) as long as they remain secret and for other Confidential Information, for as long as we continue to use the information in confidence, even if edited or revised, plus three years. We will respond promptly and in good faith to your inquiry about continued protection of any Confidential Information.

15.5 **Litigation.** You will promptly notify us of (i) any adverse or infringing uses of the Marks (or names or symbols confusingly similar), Confidential Information or other System intellectual property, and (ii) or any threatened or pending litigation related to the System against (or naming as a party) you or us of which you become aware. We alone handle disputes with third parties concerning use of all or any part of the System. You will cooperate with our efforts to resolve these disputes. We need not initiate suit against imitators or infringers who do not have a material adverse impact on the Facility, or any other suit or proceeding to enforce or protect the System in a matter we do not believe to be material.

16. Relationship of Parties.

16.1 **Independence.** You are an independent contractor. You are not our legal representative or agent, and you have no power to obligate us for any purpose whatsoever. We and you have a business relationship based entirely on and circumscribed by this Agreement. No partnership, joint venture, agency, fiduciary or employment relationship is intended or created by reason of this Agreement. You will exercise full and complete control over and have full responsibility for your contracts, daily operations, labor relations, employment practices and policies, including, but not limited to, the recruitment, selection, hiring, disciplining, firing, compensation, work rules and schedules of your employees.

16.2 **Joint Status.** If you comprise two or more persons or entities (notwithstanding any agreement, arrangement or understanding between or among such persons or entities) the rights, privileges and benefits of this Agreement may only be exercised and enjoyed jointly. The liabilities and responsibilities under this Agreement will be the joint and several obligations of all such persons or entities.

16.3 **FSH Rights.** In the event our rights to (i) any of the Marks or the Ramada System shall be terminated pursuant to the Master License Agreements (other than as a result of a purchase option we exercise as set forth therein), or (ii) we liquidate, dissolve or otherwise cease to do business then FSH or its assignee shall have the right to succeed to all of our rights in, to and under this Agreement and any other agreements between you and us entered into pursuant to this Agreement, and in such event FSH or its assignee shall be obligated to perform our duties and assume all of our obligations under any such agreements.

RAEX1IC1 2/98

17

17. <u>Legal Matters.</u>

17.1 **Partial Invalidity.** If all or any part of a provision of this Agreement violates the law of your state (if it applies), such provision or part will not be given effect. If all or any part of a provision of this Agreement is declared invalid or unenforceable, for any reason, or is not given effect by reason of the prior sentence, the remainder of the Agreement shall not be affected. However, if in our judgment the invalidity or ineffectiveness of such provision or part substantially impairs the value of this Agreement to us, then we may at any time terminate this Agreement by written notice to you without penalty or compensation owed by either party.

17.2 **Waivers, Modifications and Approvals.** If we allow you to deviate from this Agreement, we may insist on strict compliance at any time after written notice. Our silence or inaction will not be or establish a waiver, consent, course of dealing, implied modification or estoppel. All modifications, waivers, approvals and consents of or under this Agreement by us must be in writing and signed by our authorized representative to be effective.

17.3 **Notices.** Notices will be effective if in writing and delivered by facsimile transmission with confirmation original sent by first class mail, postage prepaid, by delivery service, with proof of delivery, or by first class, prepaid certified or registered mail, return receipt requested to the appropriate party at its address stated below or as may be otherwise designated by notice. Notices shall be deemed given on the date delivered or date of attempted delivery, if refused.

Ramada Franchise Systems, Inc.:
Our address:   6 Sylvan Way, P.O. Box 278, Parsippany, New Jersey 07054-0278
                       Attention: Vice President-Franchise Administration
Fax No.         (973) 496-5359

LELAND HOUSE LIMITED PARTNERSHIP COMPANY:
Your address:  400 Bagley Avenue, Detroit, Michigan 48226
                       Attention: Michael Higgins
Your fax No.:  (313) 962-1045

17.4 **Remedies.** Remedies specified in this Agreement are cumulative and do not exclude any remedies available at law or in equity. The non-prevailing party will pay all costs and expenses, including reasonable attorneys' fees, incurred by the prevailing party to enforce this Agreement or collect amounts owed under this Agreement. You consent and waive your objection to the non-exclusive personal jurisdiction of and venue in the New Jersey state courts situated in Morris County, New Jersey and the United States District Court for the District of New Jersey for all cases and controversies under this Agreement or between we and you.

17.5 **Miscellaneous.** This Agreement will be governed by and construed under the laws of the State of New Jersey. The New Jersey Franchise Practices Act will not apply to any facility located outside the State of New Jersey. This Agreement is exclusively for the benefit of the parties. There are no third party beneficiaries. No agreement between us and anyone else is for your benefit. The

RAEXHC1 2/98

section headings in this Agreement are for convenience of reference only.  We may unilaterally revise Schedule C under this Agreement.  This Agreement, together with the exhibits and schedules attached, is the entire agreement (superseding all prior representations, agreements and understandings, oral or written) of the parties about the Facility.

**17.6   Waiver of Jury Trial.  The parties waive the right to a jury trial in any action related to this Agreement or the relationship between the licensor, the licensee, any guarantor, and their respective successors and assigns.**

**18.   Special Stipulations.**   The following special stipulations apply to this Agreement and supersede any inconsistent or conflicting provisions.  These are personal to you and are not transferable or assignable except to a Permitted Transferee.

**18.1   Special Royalty.**   Notwithstanding Section 7.1, the Royalty rate on Gross Room Revenues accruing during the following periods will be as follows:

18.1.1   The Royalty shall be three percent (3.0%) of Gross Room Revenues for the term of the License Agreement.

18.1.2   The Royalty rate changes set forth in this Section automatically terminate without notice or opportunity to cure, and the Royalty shall reset to the rate specified in Section 7.1, if and as of the date (i) a Termination occurs, (ii) we send you a notice of default and you fail to cure the default within the time specified, if any, in the notice of default or, (iii) after you satisfy the Improvement Obligation, the Facility receives a quality assurance inspection score of less than 425 (or its then equivalent) and the Facility fails to achieve a quality assurance inspection score of at least 425 in a reinspection to be performed not less than 30 days after the initial inspection.

**18.2   Mandatory Rooms Addition.**   You must construct, equip and operate when completed under applicable System Standards and the approval procedures for improvements set forth in Section 3.1 of this Agreement, an addition having at least fifty (50) guest rooms (the "Addition") to the then existing Facility.  You will not be required to pay a Rooms Addition Fee for the Addition.  You must commence construction of the Addition within 90 days after the Effective Date and then proceed diligently to construct the Addition.  The Addition shall be ready for business under the System, after obtaining our approval to open (which we will not unreasonably withhold or delay), by June 1, 1999.  If the Addition has not met the aforementioned requirements by June 1, 1999, the Royalty rate changes set forth in Section 18.1 will automatically terminate and the Royalty shall be at the rate specified in Section 7.1

**18.3   Liquidated Damages Limit.**   Liquidated Damages payable upon Termination will not exceed One Thousand Dollars ($1,000.00) for each guest room of the Facility you are authorized to operate at the time of Termination.

{REMAINDER OF PAGE INTENTIONALLY BLANK}

RALXHCI 2/98

{THIS PAGE INTENTIONALLY BLANK}

RAEXHC1 2/98

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first stated above.

WE:
RAMADA FRANCHISE SYSTEMS, INC.:

By: _____        Attest: _____
      C. Wayne Miller                                   Assistant Secretary
      Vice President
      Franchise Administration

YOU, as licensee:
LELAND HOUSE LIMITED PARTNERSHIP COMPANY

BY:   Higgins Management Company
      its general partner

By: _____        Attest: _Linda Taylor_
      Michael Higgins
      President

RAEXHC1 2/98

21

## APPENDIX A

## DEFINITIONS

Agreement means this License Agreement.

Application Fee means the fee you pay when you submit your Application under Section 6.

Approved Plans means your plans and specifications for constructing or improving the Facility initially or after opening, as approved by us under Section 3.

Casualty means destruction or significant damage to the Facility by act of God or other event beyond your reasonable anticipation and control.

Chain means the network of Chain Facilities.

Chain Facility means a lodging facility we own, lease, manage, operate or authorize another party to operate using the System and identified by the Marks.

Condemnation means the taking of the Facility for public use by a government or public agency legally authorized to do so, permanently or temporarily, or the taking of such a substantial portion of the Facility that continued operation in accordance with the System Standards, or with adequate parking facilities, is commercially impractical, or if the Facility or a substantial portion is sold to the condemning authority in lieu of condemnation.

Conference Registration Fee means the fee charged for attendance at the annual RINA conference.

Confidential Information means any trade secrets we own or protect and other proprietary information not generally known to the lodging industry including confidential portions of the System Standards Manual or information we otherwise impart to you and your representatives in confidence.  Confidential Information includes the "Standards of Operation and Design Manual" and all other System Standards manuals and documentation, including those on the subjects of employee relations, finance and administration, field operation, purchasing and marketing, the Reservation System software and applications software.

Declaration means the Declaration of License Agreement you and we sign under Section 5.

Design Standards mean standards specified in the System Standards Manual from time to time for design, construction, renovation, modification and improvement of new or existing Chain Facilities, including all aspects of facility design, number of rooms, rooms mix and configuration, construction materials, workmanship, finishes, electrical, mechanical, structural, plumbing, HVAC, utilities, access, life safety, parking, systems, landscaping, amenities, interior design and decor and the like for a Chain Facility.

<u>Directory</u> means the general purpose directory we publish listing the names and addresses of Chain Facilities, and at our discretion, other Ramada facilities located outside the United States, Canada and Mexico.

<u>Effective Date</u> means the date that you first take possession of the Facility.

<u>Equity Interests</u> shall include, without limitation, all forms of equity ownership of you, including voting stock interests, partnership interests, limited liability company membership or ownership interests, joint and tenancy interests, the proprietorship interest, trust beneficiary interests and all options, warrants, and instruments convertible into such other equity interests.

<u>Equity Transfer</u> means any transaction in which your owners or you sell, assign, transfer, convey, pledge, or suffer or permit the transfer or assignment of, any percentage of your Equity Interests that will result in a change in control of you to persons other than those disclosed on Schedule B, as in effect prior to the transaction. Unless there are contractual modifications to your owners' rights, an Equity Transfer of a corporation or limited liability company occurs when either majority voting rights or beneficial ownership of more than 50% of the Equity Interests changes. An Equity Transfer of a partnership occurs when a newly admitted partner will be the managing, sole or controlling general partner, directly or indirectly through a change in control of the Equity Interests of an entity general partner. An Equity Transfer of a trust occurs when either a new trustee with sole investment power is substituted for an existing trustee, or a majority of the beneficiaries convey their beneficial interests to persons other than the beneficiaries existing on the Effective Date. An Equity Transfer does <u>not</u> occur when the Equity Interest ownership among the owners or Equity Interests on the Effective Date changes without the admission of new Equity Interest owners. An Equity Transfer occurs when you merge, consolidate or issue additional Equity Interests in a transaction which would have the effect of diluting the voting rights or beneficial ownership of your owners' combined Equity Interests in the surviving entity to less than a majority.

<u>Facility</u> means the Location, together with all improvements, buildings, common areas, structures, appurtenances, facilities, entry/exit rights, parking, amenities, FF&E and related rights, privileges and properties existing at the Location on the Effective Date or afterwards.

<u>FF&E</u> means furniture, fixtures and equipment.

<u>FF&E Standards</u> means standards specified in the System Standards Manual for FF&E and supplies to be utilized in a Chain Facility.

<u>Food and Beverage</u> means any restaurant, catering, bar/lounge, entertainment, room service, retail food or beverage operation, continental breakfast, food or beverage concessions and similar services offered at the Facility.

<u>Gross Room Revenues</u> means gross revenues attributable to or payable for rentals of guest rooms at the Facility, including all credit transactions, whether or not collected, but excluding separate charges to guests for Food and Beverage, room service, telephone charges, key for forfeitures and

RAEXHCI 2/98

entertainment; vending machine receipts; and federal, state and local sales, occupancy and use taxes.

Improvement Obligation means your obligation to either (i) renovate and upgrade the Facility, or (ii) construct and complete the Facility, in accordance with the Approved Plans and System Standards, as described in Section 3.

Indemnitees means us, our direct and indirect parent, subsidiary and sister corporations, and the respective officers, directors, shareholders, employees, agents and contractors, and the successors, assigns, personal representatives, heirs and legatees of all such persons or entities.

Initial Fee means the fee you are to pay for signing this Agreement as stated in Section 6.

License means the non-exclusive license to operate the type of Chain Facility described in Schedule B only at the Location, using the System and the Mark we designate in Section 1.

License Year means the one-year period beginning on the Opening Date and each subsequent anniversary of the Opening Date and ending on the day preceding the next anniversary of the Opening Date.

Liquidated Damages means the amounts payable under Section 12, set by the parties because actual damages will be difficult or impossible to ascertain on the Effective Date and the amount is a reasonable pre-estimate of the damages that will be incurred and is not a penalty.

Location means the parcel of land situated at 400 Bagley Avenue, Detroit, Michigan 48226, as more fully described in Schedule A.

Losses and Expenses means all payments or obligations to make payments either (i) to or for third party claimants by any and all Indemnitees, including guest refunds, or (ii) incurred by any and all Indemnitees to investigate, respond to or defend a matter, including without limitation investigation and trial charges, costs and expenses, attorneys' fees, experts' fees, court costs, settlement amount judgments and costs of collection.

Maintenance Standards means the standards specified from time to time in the System Standards Manual for repair, refurbishment and replacement of FF&E, finishes, decor, and other capital items and design materials in Chain Facilities.

Marks means, collectively (i) the service marks associated with the System published in the System Standards Manual from time to time including, but not limited to, the name, design and logo for "Ramada" and other marks (U.S. Reg. Nos. 849,591 and 1,191,422) and (ii) trademarks, trade names, trade dress, logos and derivations, and associated good will and related intellectual property interests.

Marks Standards means standards specified in the System Standards Manual for interior and exterior Mark-bearing signage, advertising materials, china, linens, utensils, glassware, uniforms, stationery, supplies, and other items, and the use of such items at the Facility or elsewhere.

Minor Renovation means the repairs, refurbishing, repainting, and other redecorating of the interior, exterior, guest rooms, public areas and grounds of the Facility and replacements of FF&E we may require you to perform under Section 3.16.

Minor Renovation Ceiling Amount means $3,000.00 per guest room.

Minor Renovation Notice means the written notice from us to you specifying the Minor Renovation to be performed and the dates for commencement and completion given under Section 3.16.

Opening Date means the date on which we authorize you to open the Facility for business identified by the Marks and using the System.

Operations Standards means standards specified in the System Standards Manual for cleanliness, housekeeping, general maintenance, repairs, concession types, food and beverage service, vending machines, uniforms, staffing, employee training, guest services, guest comfort and other aspects of lodging operations.

Permitted Transferee means (i) any entity, natural person(s) or trust receiving from the personal representative of an owner any or all of the owner's Equity Interests upon the death of the owner, if no consideration is paid by the transferee  or (ii) the spouse or adult issue of the transferor, if the Equity Interest transfer is accomplished without consideration or payment, or (iii) any natural person or trust receiving an Equity Interest if the transfer is from a guardian or conservator appointed for an incapacitated or incompetent transferor.

Punch List means the list of upgrades and improvements attached as part of Schedule B, which you are required to complete under Section 3.

Recurring Fees means fees paid to us on a periodic basis, including without limitation, Royalties, RINA Services Assessment Fees, and other reservation fees and charges as stated in Section 7.

Relicense Fee means the fee your transferee or you pay to us under Section 7 when a Transfer occurs.

Reservation System or "Central Reservation System" means the system for offering to interested parties, booking and communicating guest room reservations for Chain Facilities described in Section 4.2.

RINA means the Ramada Inns National Association.

RINA Services Assessment Fees means the assessments charged as set forth in Section 7.1.2.

<u>Rooms Addition Fee</u> means the fee we charge you for adding guest rooms to the Facility.

<u>Royalty</u> means the monthly fee you pay to us for use of the System under Section 7.1.1. "Royalties" means the aggregate of all amounts owed as a Royalty.

<u>System</u> means the comprehensive system for providing guest lodging facility services under the Marks as we specify which at present includes only the following: (a) the Marks; (b) other intellectual property, including Confidential Information, System Standards Manual and know-how; (c) marketing, advertising, publicity and other promotional materials and programs; (d) System Standards; (e) training programs and materials; (f) quality assurance inspection and scoring programs; and (g) the Reservation System.

<u>System Standards</u> means the standards for the participating in the System published in the System Standards Manual, including but not limited to Design Standards, FF&E Standards, Marks Standards, Operations Standards, Technology Standards and Maintenance Standards and any other standards, policies, rules and procedures we promulgate about System operation and usage.

<u>System Standards Manual</u> means the Standards of Operation and Design Manual and any other manual we publish or distribute specifying the System Standards.

<u>Taxes</u> means the amounts payable under Section 7.2 of this Agreement.

<u>Technology Standards</u> means standards specified in the System Standards Manual for local and long distance telephone communications services, telephone, telecopy and other communications systems, point of sale terminals and computer hardware and software for various applications, including, but not limited to, front desk, rooms management, records maintenance, marketing data, accounting, budgeting and interfaces with the Reservation System to be maintained at the Chain Facilities.

<u>Term</u> means the period of time during which this Agreement shall be in effect, as stated in Section 5.

<u>Termination</u> means a termination of the License under Sections 11.1 or 11.2 or your termination of the License or this Agreement.

<u>Transfer</u> means (1) an Equity Transfer, (2) you assign, pledge, transfer, delegate or grant a security interest in all or any of your rights, benefits and obligations under this Agreement, as security or otherwise without our consent as specified in Section 9, (3) you assign (other than as collateral security for financing the Facility) your leasehold interest in (if any), lease or sublease all or any part of the Facility to any third party, (4) you engage in the sale, conveyance, transfer, or donation of your right, title and interest in and to the Facility, (5) your lender or secured party forecloses on or takes possession of your interest in the Facility, directly or indirectly, or (6) a receiver or trustee is appointed for the Facility or your assets, including the Facility. A Transfer does not occur when you pledge or encumber the Facility to finance its acquisition or improvement, you refinance it, or you engage in a Permitted Transferee transaction.

RAEXHC1 2/98

26

"You" and "Your" means and refers to the party named as licensee identified in the first paragraph of this Agreement and its Permitted Transferees.

"We", "Our" and "Us" means and refers to Ramada Franchise Systems, Inc., a Delaware corporation, its successors and assigns.

RAEXHCl 2/98

## SCHEDULE A

(Legal Description of Facility)

RAEXHC1 2/98

28

## SCHEDULE B

PART I:      YOUR OWNERS:

| Name | Ownership Percentage | Type of Equity Interest |
|------|---------------------|-------------------------|
| Higgins Management Company | 100.00% | General Partner |

PART II:      THE FACILITY:

      Primary designation of Facility: Ramada

      Number of approved guest rooms: 100

      Parking facilities (number of spaces, description): 100

      Other amenities, services and facilities:

PART III:      DESCRIPTION AND SCHEDULE OF RENOVATIONS TO BE
              COMPLETED AS THE IMPROVEMENT OBLIGATION:

**[Punch List to be attached.]**

RAEXHCI 2/98

29

## SCHEDULE C

### February 1998

The RINA Services Assessment Fee is equal to 4.5% of Gross Room Revenues.

The GDS Fee described in Section 7 is $3.50 per gross reservation communicated through the Global Distribution System and $2.50 per gross reservation booked through the Internet. The travel agent commission described in Section 7 is 10% of the Gross Room Revenues generated by each reservation originated by the agent plus our service charge of $0.35 per reservation. The general sales agent commission (also known as international sales office commission) is 5% of the Gross Room Revenues generated by each reservation originated in a place outside the United States in which the Chain is represented by a general sales agent/international sales office.

The RINA Services Assessment Fee is subject to change for all Chain facilities, and new fees and charges may be assessed for new services, but only upon the recommendation of the Executive Committee of RINA and our approval.

## GUARANTY

To induce RAMADA FRANCHISE SYSTEMS, INC., its successors and assigns ("you") to sign the License Agreement (the "Agreement") with the party named as the "Licensee," to which this Guaranty is attached, the undersigned, jointly and severally ("we, "our" or "us"), irrevocably and unconditionally (i) warrant to you that Licensee's representations and warranties in the Agreement are true and correct as stated, and (ii) guaranty that Licensee's obligations under the Agreement, including any amendments, will be punctually paid and performed.

Upon default by Licensee and notice from you we will immediately make each payment and perform or cause Licensee to perform, each unpaid or unperformed obligation of Licensee under the Agreement. Without affecting our obligations under this Guaranty, you may without notice to us extend, modify or release any indebtedness or obligation of Licensee, or settle, adjust or compromise any claims against Licensee. We waive notice of amendment of the Agreement. We acknowledge that Section 17 of the Agreement, including Sections 17.4 (Remedies, Choice of Venue and Consent to Jurisdiction) and 17.6 (Waiver of Jury Trial), applies to this Guaranty.

Upon the death of an individual guarantor, the estate of the guarantor will be bound by this Guaranty for obligations of Licensee to you existing at the time of death, and the obligations of all other guarantors will continue in full force and effect.

IN WITNESS WHEREOF, each of us has signed this Guaranty effective as of the date of the Agreement.

WITNESSES:                                    GUARANTORS:

_Linda Taylor_                                _Michael W Higgins_ (Seal)
                                              MICHAEL HIGGINS

RAEXHC1 2/98

31

JS 14 11/99

# CIVIL COVER SHEET

COUNTY IN WHICH THIS ACTION AROSE: Wayne

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.

## 05-73472

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| LELAND HOUSE LIMITED PARTNERSHIP | RAMADA FRANCHISE SYSTEMS, INC. n/k/a RAMADA WORLDWIDE INC., |

(b) County of Residence of First Listed: _____

County of Residence of First Listed: _____

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

(c) Attorneys (Name, Address and Telephone Number)
Martin C. Weisman (P22139)
Weisman, Young, et al.
30100 Telegraph Rd., Suite 428
Bingham Farms, Michigan 48025
(248) 258-2700

Attorneys (If Known)
Jason P. Klingensmith (P61687)
Dickinson Wright PLLC
500 Woodward Ave., Suite 4000
Detroit, Michigan 48226-3425
(313) 223-3500

JUDGE MARIANNE O. BATTANI

MAGISTRATE JUDGE DONALD A. SCHEER

## II. BASIS OF JURISDICTION (Place an "X" In One Box Only)

- ☐ 1 U.S Government Plaintiff
- ☐ 3 Federal Question (U.S. Government Not a Party)
- ☐ 2 U.S. Government Defendant
- ☒ 4 Diversity (Indicate Citizenship of Parties In Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" In One Box for Plaintiff and One Box for Defendant)

(For Diversity Cases Only)

| | PLA | DEF | | PLA | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" In One Box Only)

### CONTRACT
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment and Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)
- ☐ 153 Recovery of Overpayment of Veteran's Benefits
- ☒ 160 Stockholders' Suits
- ☒ 190 Other Contract
- ☐ 195 Contract Product Liability

### TORTS

**PERSONAL INJURY**
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel And Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury

**PERSONAL INJURY**
- ☐ 362 Personal Injury- Med. Malpractice
- ☐ 365 Personal Injury- Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

**PERSONAL PROPERTY**
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

### FORFEITURE/PENALTY
- ☐ 610 Agriculture
- ☐ 620 Other Food & Drug
- ☐ 625 Drug Related Seizure of Property 21:881
- ☐ 630 Liquor Laws
- ☐ 640 R.R. & Truck
- ☐ 650 Airline Regs.
- ☐ 660 Occupational Safety/Health
- ☐ 690 Other

### LABOR
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Mgmt. Relations
- ☐ 730 Labor/Mgmt. Reporting & Disclosure Act
- ☐ 740 Railway Labor Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Empl. Ret. Inc. Security Act.

### BANKRUPTCY
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

### PROPERTY RIGHTS
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

### SOCIAL SECURITY
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

### FEDERAL TAX SUITS
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS—Third Party 26 USC 7609

### OTHER STATUTES
- ☐ 400 State Reapportionment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce/ICC
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced & Corrupt Organizations
- ☐ 810 Selective Service
- ☐ 850 Securities/Commodities Exchange
- ☐ 875 Customer Challenge 12 USC 3410
- ☐ 891 Agricultural Acts
- ☐ 892 Economic Stabilization Act
- ☐ 893 Environmental Matters
- ☐ 894 Energy Allocation Act
- ☐ 895 Freedom of Information Act
- ☐ 900 Appeal of Fee Determination Under Equal Access to Justice
- ☐ 950 Constitutionality of State Statutes
- ☐ 890 Other Statutory Actions

### REAL PROPERTY
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

### CIVIL RIGHTS
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/ Accommodations
- ☐ 444 Welfare
- ☐ 440 Other Civil Rights

### PRISONER PETITIONS
- ☐ 510 Motions to Vacate Sentence Habeas Corpus:
- ☐ 530 General
- ☐ 535 Death Penalty
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition

## V. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

- ☐ 1 Original Proceeding
- ☒ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION (Cite the U.S Civil Statute under which you are filing and write brief statement of cause. Do not cite jurisdictional statutes unless diversity.)

Breach of Contract Action Removed Pursuant to 28 U.S.C. SEc. 1332, 1441, 1446

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

$ DEMAND

CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes ☒ No

## VII. RELATED CASE(S) IF ANY

(See Instructions)

JUDGE _____   DOCKET NUMBER _____

DATE
September 8, 2005

SIGNATURE OF ATTORNEY OF RECORD
X Jason P. Klingensmith (P61687)

## PURSUANT TO LOCAL RULE 83.11

1.      Is this a case that has been previously dismissed?                    ☐ Yes
                                                                              ☑ No

If yes, give the following information:

Court: _____

Case No.: _____

Judge: _____


2.      Other than stated above, are there any pending or previously
        discontinued or dismissed companion cases in this or any other       ☐ Yes
        court, including state court? (Companion cases are matters in which   ☑ No
        it appears substantially similar evidence will be offered or the same
        or related parties are present and the cases arise out of the same
        transaction or occurrence.)

If yes, give the following information:

Court: _____

Case No.: _____

Judge: _____


Notes :